**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
SAYANTANI GHOSE,                                     :
                                                     :        Civil Action No.:
                              Plaintiff,             :
                                                     :
               v.                                    :        **COMPLAINT**
                                                     :
ERNST & YOUNG, LLP                                   :
                                                     :        **Jury Trial Demanded**
                              Defendants.            :
-------------------------------------------------------------X

Plaintiff Sayantani Ghose hereby alleges as follows:

**PRELIMINARY STATEMENT**

1.      Sayantani Ghose ("Ghose") contributed enormously to Ernst & Young, LLP

("EY") for 15 years, moved up the ranks to partner and became an internationally known expert

in transfer pricing, only to have her career at EY end because she refused to sign off on

transactions that she believed violated tax and securities laws.  Put another way, EY punished

Ghose for diligently and thoroughly carrying out her professional responsibilities as an auditor

because it could upset EY's clients and negatively impact EY's bottom line.

2.      Transfer pricing is one of, if not the, most important international tax issue for

large and small multinational businesses.  When transfer pricing is not done correctly, companies

shift profit to lower tax jurisdictions and unlawfully dodge paying taxes in other jurisdictions,

and, therefore, it is frequently audited by tax authorities around the world.  It receives close

attention from the Internal Revenue Service ("IRS").  If multinational businesses do not manage

transfer pricing correctly, they could end up facing large income tax assessments along with

additional related interest and civil penalties over multiple tax years.  Ghose took her role as an

expert in transfer pricing extremely seriously and worked methodically and meticulously to ensure her clients managed transfer pricing appropriately within the regulations.

3.      EY, for its part, however, was more concerned about appeasing its clients rather than adhering to sound auditing principles and judgment.  EY has a checkered history of issues related to its auditing practices.

4.      In 2022, EY agreed to pay a $100 million fine because its own auditors were cheating on ethics exams.  The Securities and Exchange Commission ("SEC") regulators determined that between 2017 and 2021 hundreds of EY employees cheated on ethics exams that were required to obtain or maintain professional licenses and that EY did not do enough to stop the practice.  EY admitted that it claimed in a submission to the SEC that it did not have current issues with cheating when, in fact, EY had been informed of potential cheating on exams.  Even after EY confirmed there had been cheating, it failed to correct its submission to the SEC.  The $100 million is the largest fine imposed by the SEC against an auditing firm.

https://www.nytimes.com/2022/06/28/business/ernst-young-sec-cheating.html.

5.      In 2008, Wirecard AG ("Wirecard") asked EY to look into shareholder allegations that Wirecard counted customer deposits as its own cash.  EY found nothing wrong and became the company's auditor.  In June 2020, the company collapsed after approximately $2 billion it claimed to have in trustee-controlled bank accounts in Asia could not be found.  EY failed to notice that the entity which supposedly held much of the cash was not licensed to operate a trust business, something easily verifiable on a government website.  An accounting watchdog said EY auditors need to be more skeptical and stated that there "should be more emphasis on challenge of management" at audit clients. https://www.wsj.com/articles/string-of-firms-that-imploded-have-something-in-common-ernst-young-audited-them-11602863319.

6.      EY issued a "comfort letter" in a deal for Luckin Coffee Inc. ("Luckin") to raise money in a stock and bond sale in January 2020.  The letter from EY to the underwriters of the deal indicated that EY had no issues with Luckin's financial results.  Less than one month later an anonyomous report was published indicating that Luckin's sales appeared overstated.  EY assured Luckin's board that there were no issues, only to later realize that there were, in fact, issues with Luckin's sales numbers - $300 million of revenue had been fabricated.  Id.

7.      In 2021, EY agreed to pay approximately $10 million in relation to charges that they violated auditor independence rules where the SEC claimed that EY partners interfered with a public company's selection of an auditor threatening their ability to remain objection and impartial as auditors.  https://www.reuters.com/business/finance/ernst-young-auditors-pay-over-10-mln-settle-sec-charges-2021-08-02/

8.      In 2010, the New York Attorney General alleged that EY approved the surreptitious removal of tens of billions of dollars of debt from Lehman Brothers Holdings ("Lehman") balance sheet to make the investment bank appear less indebted at the close of financial quarters.  EY agreed to pay $10 million; it also previously agreed to pay $99 million in damages to investors in a class action settlement related to EY's auditors' reports which provided cover in helping clients hide material information.  https://www.reuters.com/article/us-ernst-lehman-bros/ernst-young-settles-with-n-y-for-10-million-over-lehman-auditing-idUSKBN0N61SM20150415.

9.      In 2016, the SEC took an enforcement action against EY for negligence in the auditing of Weatherford International plc ("Weatherford").  The SEC found that "Ernst & Young engagement personnel did not understand the basis for the dividend exclusion adjustment each year and failed to seek sufficient competent evidential matter to discern the purpose, nature, and

extent of the dividend exclusion adjustments and the related phantom income tax receivable on the financial statements.  Instead, oral representations by Weatherford's tax manager were the sole basis for Ernst & Young's conclusions that the dividend exclusion adjustments were reasonable . . . The audit team failed to take appropriate action in response to red flags regarding Weatherford's evolving and inconsistent reasoning behind its dividend exclusion adjustments." *In the Matter of Ernst & Young LLP*, SEC File No. 3-17628 (Oct. 18, 2016), available at https://www.sec.gov/litigation/admin/2016/34-79109.pdf.

10.     Even with this history of scandals and auditing issues that have been discovered, and which EY has been forced to pay large fines and settlements to resolve, EY continues to flout the professional skepticism each and every auditor is required by law to exhibit. Unfortunately, that is why when Ghose refused to turn a blind eye to conduct that she believed violated securities and tax laws, EY decided she should no longer be an auditor for the firm. When Ghose made it clear that she would continue to exercise professional skepticism in her audits, EY retaliated against her by giving her significantly lower performance reviews and removing her from accounts, effectively reducing her pay, alienating and circumventing her, subjecting her to a hostile work environment, denying her promotion opportunities – including by passing her up for a promotion that EY instead gave to a man who had previously been the subject of a sexual misconduct complaint – constructively discharging her employment and ultimately terminating her after she gave notice, despite the fact that EY regularly pays employees through their notice period.

11.     Accordingly, Ghose files this complaint of whistleblower retaliation against EY pursuant to the employee protection provisions of the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A ("SOX"), and the Taxpayer First Act, 26 U.S.C. § 7623(d) ("TFA").

## ADMINISTRATIVE PREREQUISITES

12.     On February 17, 2021, Plaintiff filed a Charge of Retaliation with the Occupational Safety and Health Administration ("OSHA") in which she alleged violations of the whistleblower protection provisions of SOX and the TFA.  On September 14, 2021, Plaintiff filed a Supplemental Charge of Retaliation with OSHA in which she alleged further violations of the whistleblower protection provisions of SOX and the TFA.

13.     More than 180 days have passed since the filing of Plaintiff's OSHA Charge and Supplement Charge.  OSHA has not yet reached a final determination with respect to the allegations contained in Plaintiff's OSHA Charge and Supplement Charge.  Accordingly, pursuant to 18 U.S.C. § 1514A, Plaintiff is entitled to seek *de novo* review of her allegations from this Court.

14.     Any and all other prerequisites to the filing of this suit have been met.

## JURISDICTION AND VENUE

15.      The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, as this action is brought under federal statuory law; namely, SOX and the TFA.

16.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## PARTIES

17.     Ghose is a resident of Connecticut and worked at EY from July 5, 2006 until her abrupt termination on January 7, 2022.

18.     EY is an audit firm that provides assurance, tax, and transaction services to its clients.  EY's U.S. operations are incorporated in Delaware and headquartered in New York, New York.

**FACTUAL ALLEGATIONS**

I.     **GHOSE EXCELS AT EY AND BECOMES A PARTNER AFTER NINE YEARS**

19.     Ghose started working at EY in 2006 and exceled from the outset, quickly proving her knowledge, work ethic, and expertise.  She rapidly moved up the ranks from a junior position to principal[1] in nine years.

20.     By the time she was promoted to the partnership, Ghose was well known across the Firm as an expert in transfer pricing of financial transactions.  Given this expertise, she has held senior roles, or routinely brought in as a subject matter expert on the accounts of key clients, including Anheuser-Busch, Synchrony Financial, GE Capital, Shell, and Siemens AG, among others.  Ghose consistently went above and beyond the requirements of her position at EY, including staying at the office and working overnight to complete assignments often sacrificing health and personal life.

21.     Ghose's performance consistently met the goals her supervisors set for her and exceeded that of her peers, and the positive performance reviews she received reflected her hard work and expertise.

22.     For 2018 and 2019, she received a rating of "differentiating," the third of four possible levels of performance.

23.     In 2020, she was the second most utilized partner out of nine on her team.

---

[1]     Principal is the non-CPA equivalent of partner at EY.

24.     Prior to the unlawful retaliation described herein, Ghose's trajectory and career prospects at EY were limitless, and she intended on working for EY until her eventual retirement.

## II.     EY'S HISTORY IS FROUGHT WITH ETHICALLY QUESTIONABLE AUDITS AND PRACTICES

25.     As the Supreme Court held in a case brought against EY's predecessor, "the independent auditor assumes a public responsibility transcending any employment relationship with the client.  The independent public accountant performing this special function owes ultimate allegiance to the corporation's creditors and stockholders, as well as to the investing public.  This 'public watchdog' function demands that the accountant maintain total independence from the client at all times and requires complete fidelity to the public trust." *United States v. Arthur Young & Co.*, 465 U.S. 805, 817-18 (1984).

26.     In addition, in connection with a SEC Enforcement Action against EY, the SEC noted that "[a]n auditor must exercise professional skepticism, which is an attitude that includes 'a questioning mind and a critical assessment of audit evidence.'"  See AU § 230.07.  "Since evidence is gathered and evaluated throughout the audit, professional skepticism should be exercised throughout the audit process."  See AU § 230.08.  "In exercising professional skepticism, an auditor should not be satisfied with less than persuasive evidence because of a belief that management is honest."  See AU § 230.09; AU § 316.13.  Whenever the auditor has concluded that there is significant risk of material misstatement of the financial statements, the auditor should consider this conclusion in determining the nature, timing, or extent of procedures.  "Higher risk may cause the auditor to expand the extent of procedures applied, apply procedures closer to or as of year end, particularly in critical audit areas, or modify the nature of procedures to obtain more persuasive evidence."  See AU § 312.17.  In addition,

PCAOB standards require auditors to exercise due professional care in the "application of field work and reporting standards to a review of interim financial information."  See AS § 4105.01.

27.     EY also has adopted and claims to adhere to a Global Code of Conduct that sets forth the rules of the road governing all client engagements and client services.  Ghose has received training about the Code of Conduct.  The Code articulates the following polices and principles:

- "Each of us has the obligation to respond in a manner consistent with our values whenever we encounter an issue, including speaking up when we see behavior that compromises the principles of this Code."

- "We are robust and courageous in our challenges to clients and are not afraid to deliver unwelcome information to them."

- "We reject unethical or illegal business practices in all circumstances."

- "We avoid working with clients and others whose standards are incompatible with our Global Code of Conduct."

28.     In accordance with PCAOB standards and EY's Global Code of Conduct, Ghose consistently exhibits professional skepticism in carrying out her job duties, including when she performs transfer pricing analysis that is relied upon by EY audit partners.

29.     Unfortunately, historically, the same professional skepticism and adherence to applicable ethical standards has not been consistently exhibited by EY's auditors.

30.     As noted above, a sampling of a long history of EY's audit failings includes:

- $100 million fine because EY's own auditos were cheating on ethics exams;

- Failing to verify the veracity of the account holder of approximately $2 billion in Wirecard's audit;

- Incorrectly verifying $300 million in revenue in Luckin audit;

- Failing to take appropriate action in response to red flags regarding Weatherford's dividend exclusion adjustments;

- Agreed to pay $10 million and $99 million in response to EY's auditors' reports assisting Lehman in hide material information.

## III.   GHOSE DISCOVERS AND DISCLOSES FRAUD ON THE SUSPECT CLIENT A ACCOUNT

### A.   While working as a subject matter expert on the Suspect Client A account, Ghose discovers significant discrepancies in data

31.     In January 2020, Bill Macey and Miller Williams from EY's U.S. transfer pricing team initiated Ghose's involvement as the transfer pricing subject matter expert on a particular client account (the "Suspect Client A" account).

32.     Ghose's role would be to assess transfer pricing issues related to Suspect Client A's intercompany loan practices and associated interest rates, assess the IRS's ongoing audit and notice of proposed adjustment ("NOPA") on these issues, and determine what actions the company would have to take to comply with applicable laws.

33.     Suspect Client A's U.S. holding company ("Suspect Client A1") had received over $20 billion in intercompany loans since 2009 from a foreign affiliate ("Suspect Client A2"), and the IRS was simultaneously auditing these issues of using inflated interest rates to shift income out of US to foreign jurisdictions with lower tax rates.

34.     The main question for Ghose was whether Suspect Client A needed to keep a reserve fund to cover possible tax adjustments, since the IRS had begun auditing the company on these issues and raising questions about the credit ratings the company had calculated for Suspect Client A1, Suspect Client A's top-level company in the U.S.

35.     The credit rating directly correlated with the interest rates for the intercompany loans, and where an entity had a lower credit rating, it would pay a higher interest rate. At the

time, the transfer pricing team's position was that the reserve requirement would depend on the reasonableness of Suspect Client A's original analysis of Suspect Client A1's credit rating.

36.     Around January 27, 2020 the IRS issued a draft NOPA to Suspect Client A that questioned the quality and accuracy of the company's original analysis, and as a result the company had to assess whether it had sufficient support for its position that it did not need to keep a reserve of funds for a possible tax adjustment.

37.     Ghose soon realized, based on her knowledge and expertise in the area, that the interest rates that the Suspect Client A1 had been paying to its foreign affiliates for the intercompany loans were far higher than they should have been.

38.     Further, in their initial analysis, Ghose and her team identified serious data inconsistencies in the data that Suspect Client A had provided to EY to support its position.

39.     On a January 28, 2020 call with EY members and supervisors, including Stephen Landry ("Landry"), the lead Global Compliance and Reporting ("GCR") partner on Suspect Client A's account, Ghose communicated her concern that Suspect Client A would face legal and tax liability from Suspect Client A1's overpayment of interest expense and the company's need to maintain a reserve.

40.     After conducting an initial analysis, on February 6, 2020, Ghose and her team contacted the EY GCR team involved with the case.  The team identified problems with Suspect Client A's data and requested further information from the company.  Specifically, they requested that Suspect Client A reconcile discrepancies in the financial data that Suspect Client A had provided to EY and the financial data the IRS had used in the NOPA.  The team outlined that they had reviewed financial data Suspect Client A had provided to them and data included in

the draft IRS NOPA, and they had found significant variations in information based on the source of the data, as well as other difficult-to-explain variations.

### B.   Ghose and her team request supporting information from Suspect Client A and encounter resistance from Suspect Client A and the EY GCR team

41.     In February, to help them diligently assess Suspect Client A's position and the accuracy of the credit rating information and related interest rates, Ghose and her team requested supporting information from the company.

42.     As Ghose and her team attempted to gather the information necessary to perform an independent analysis, they encountered resistance from Suspect Client A and from within the EY GCR team.  The company insisted that rather than perform an independent analysis, EY in its assessment should simply replicate what the company had already done, using the flawed data and method of analysis that the company had used.

43.     When Landry contacted a tax officer at Suspect Client A, with the team's information request, the tax officer questioned the team's proposed methodology.  The tax officer asked if EY planned on using Moody's mapping grid, the method that Suspect Client A had already used to assess the credit ratings.  Ghose and her team replied that they intended to use Risk Calc, a different program also offered by Moody's.  Landry, however, pushed the team to use Moody's grid instead to placate the client.

44.     Ghose replied to Landry that the team had based their decision to use Risk Calc on their finding that the program provided results that were generally consistent with the public credit rating for Suspect Client A's U.S. subsidiary ("Suspect Client A3"), and the main operating entity owned by Suspect Client A1.  She continued that she believed that problems with the quality of the data the team had received from Suspect Client A could be exaggerated by

a grid-based analysis, and she emphasized that the team had no way of verifying the quality of the data Suspect Client A had provided.

45.     On or about March 12, 2020, Ghose explained that she would not sign off on the company's practices based on flawed data and incomplete methods.  She highlighted that even if the grid-based approach confirmed Suspect Client A's assessment of a BB rating for Suspect Client A1, she would still not be comfortable signing off on that rating because it would be commercially impossible based on Suspect Client A3's public rating of AA, and instead such a result would lead her to believe that the team had not taken the correct approach.

**C.      Ghose and her team continue to press Suspect Client A about irregularities in the data it had provided to EY**

46.     On March 18, 2020, in response to Ghose and her the team's repeated requests for clarification as to discrepancies in the data Suspect Client A had provided, the company acknowledged inconsistencies in the data but did not address how the discrepancies could have impacted the credit rating analysis.

47.     Ghose and her team knew the discrepancies in data would have influenced the credit rating analysis because the grid-based method Suspect Client A had used was very data sensitive.  By using faulty data, Suspect Client A's method rated Suspect Client A1's credit lower than it should have been, thus causing the interest rates on the loans Suspect Client A1 had received from Suspect Client A's foreign affiliate to be far higher than they should have been.

48.     Suspect Client A1 was able to claim the amount they paid in interest on the loans as an expense, therefore taking a deduction on its taxes in that amount in the US and excessive income in the jurisdiction of the foreign affiliate .  With the interest rates higher than they reasonably should have been, Suspect Client A1 had deducted more than it should have thus inappropriately shifting income from the US to a foreign jurisdiction.

> **D.     Ghose determines that Suspect Client A should have a reserve of approximately $800 million to prepare for tax adjustments, and the IRS issues a final NOPA**

49.     Despite Suspect Client A hiring an expert to attempt to defend its position that its calculations of Suspect Client A1's credit rating and related interest rates were correct, Ghose continued to do her job to the best of her ability and tried to ensure that Suspect Client A was complying with federal securities and tax laws.

50.     On May 18, 2020, Ghose's team contacted the EY GCR team with their calculation of Suspect Client A1's overpayment of interest expense.  Ghose's team explained that they had not been able to confirm the reliability of Suspect Client A's data nor the method it had used to calculate credit ratings.

51.     The team also explained that they had requested that Suspect Client A provide them with the data it had used to calculate Suspect Client A3's credit rating, so the team could run the Moody's grid analysis and determine if the rating reached through this method aligned with Suspect Client A3's public rating.  However, Suspect Client A had still not provided the necessary data for EY to assess the accuracy of its methods and continued to evade the team's clarification questions.

52.     Based on the information they had, their assessment of Suspect Client A1's credit rating, and their extensive methods of calculating credit ratings, Ghose and her team determined that Suspect Client A1's estimated preliminary overpayment of interest expense for the years 2011-2018 was $2.36 billion to $3.9 billion.

53.     At this point, Landry suggested to Ghose and her team that the company did not need to have a reserve for possible tax adjustments in place for Q1 because the NOPA was still a draft and had not been finalized.

54.     In early June 2020, the IRS issued its final NOPA to Suspect Client A, which included a more rigorous analysis and additional criticism of the original method the company had used to determine credit ratings.

55.     Ghose sent an updated exposure calculation to GCR on June 25, 2020.  This calculation determined that a tax adjustment based on the interest expense paid by Suspect Client A1 could be between $708,123,919 and $912,723,686.

56.     From this point on, Ghose repeatedly communicated to Landry and others that Suspect Client A should keep a reserve of $800 million for a likely tax adjustment.

**E.     EY shops for other internal opinions that better align with Suspect Client A's position**

57.     One day after Ghose sent her updated exposure calculation to GCR, EY senior management began looking for different opinions from within the organization that would better align with Suspect Client A's position that a reserve was unnecessary.

58.     On June 25, 2020, Allister Wilson, lead UK audit partner, informed EY members working on the account of Suspect Client A's position; namely, that the IRS's arguments were weak, and the IRS would lose on the basis of those arguments, but if the matter were to proceed to a negotiation or litigation, the IRS might present stronger arguments.

59.     Matthew Rychlicki ("Rychlicki"), a tax partner, replied that EY had reviewed a report Suspect Client A's expert had provided, and EY's position remained unchanged.

60.     Wilson responded that he was concerned that EY's position was the opposite of Suspect Client A's, and he proposed consulting a different transfer pricing partner.

61.     In an attempt to obtain a second, different opinion from within EY that would align with the client's position, Landry reached out to Purvez Captain ("Captain"), global lead for transfer pricing in the energy sector, informed him that EY was in a difficult position on a

14

transfer pricing issue with Suspect Client A, and asked if Captain had time to consult on the matter. Landry continued that Macey had originally been involved but had deferred to a financial services office ("FSO") transfer pricing partner in New York.  Captain asked for the name of the FSO partner involved and reminded Landry that FSO partners have the last say on any financial services transfer pricing issues, per the EY quality and risk management rules.

62.     Landry responded that Ghose was the partner, and he acknowledged her expertise in the area, but he explained that the client was insistent in its position opposite to Ghose's, so EY was grappling with client relationship issues.

63.     Captain's response was unequivocal, and he stated that Ghose is one of the top FSO transfer pricing experts in the U.S. across all firms, he relies on her knowledge for all of his financial services work, and he would certainly do so in the matter in question.

64.     Nevertheless, EY GCR continued to search for someone who would agree with the client.

65.     On June 29, 2020, Ghose contacted Rychlicki and Nikhil Jain, another partner, to explain her reasonable belief that Suspect Client A had used an inappropriate method to determine credit ratings and had arrived at an incorrect result regarding Suspect Client A1's credit rating.

66.     Ghose explained that Suspect Client A's position was that Moody's grid-based method was the best method for determining the credit rating for Suspect Client A1; there was no requirement that Suspect Client A provide other support for the credit rating based on U.S. transfer pricing regulations; and based on Suspect Client A's application of the grid method for the credit rating, the credit rating for Suspect Client A1 was Ba2/BB.

67.     She further explained her team's position and observations under her guidance and expertise.  She explained that the publicly-available credit rating for Suspect Client A3 as provided by Moody's and S&P, was Aa2/AA, and there was a differential of nine notches between the publicly-available rating of Suspect Client A3 and Suspect Client A's internal rating for Suspect Client A1 (the holding company for Suspect Client A3), raising a question as to whether Suspect Client A's application of the grid-based method provided a reliable result for Suspect Client A1.

68.     Ghose explained that Suspect Client A1's credit rating may be slightly weaker than Suspect Client A3.  Therefore, she and her team considered a credit rating in the range of A2/A to be appropriate for Suspect Client A1.  Ghose explained that this decision was consistent with the stand-alone credit rating EY had obtained for Suspect Client A1 using the Risk Calc-based analysis, and this was the same stand-alone credit rating for Suspect Client A1 that the IRS had arrived at in the final NOPA.  Ghose concluded that she and her team had based their reserve calculations on a credit rating range of A2/A.

69.     Rychlicki suggested that they consult with Tom Tsiopoulos ("Tsiopoulos"), FSO transfer pricing lead and Ghose's supervisor, to get EY's view of the matter.  Tsiopoulos had significant experience in advising clients on transfer pricing issues related to financial transactions; he refrained from getting involved, however, and suggested Ghose consult with another financial services partner for his opinion, who, then discussed the situation with Ghose, and came to similar conclusions as she had.

**F.     Ghose reiterates her belief that Suspect Client A's position is unreasonable and the company must prepare a reserve for an IRS adjustment**

70.     On July 10, 2020, Ghose sent a memo to Landry, Rychlicki, and others on the team reviewing the Suspect Client A audit.  Ghose clearly stated the main issue in the case: that

the company was focusing on the best technique for determining a credit rating, instead of answering the essential question of what was the reasonable rating for Suspect Client A1 given the publicly-available information.

71.     The memo went into detail as to the reasonableness of Ghose and her team's conclusion.  The memo cited as support for the team's position the IRS's conclusions in the NOPA that 1) Moody's grid-based method was not an appropriate method for evaluating Suspect Client A1's credit rating; 2) Suspect Client A1's stand-alone credit rating was A/A2 as obtained by Risk Calc; and 3) Suspect Client A's incorrect determination of Suspect Client A1's credit rating resulted in interest rate calculations that did not meet the arm's length standard as articulated in Internal Revenue Code ("I.R.C.") §482.[2]

72.     The memo explained Ghose's team's final position that: 1) Suspect Client A had failed to provide any explanation or information as to why it completely ignored the publicly-available credit rating for Suspect Client A3 as a starting point to estimate the proper credit ratings for Suspect Client A1; 2) the publicly-available information on the credit ratings had been a reasonable starting point, and the company had chosen to ignore this information; and 3) Moody's grid was not reliable to obtain Suspect Client A1's credit rating due to data limitation. Finally, the memo stated that in reaching its decision, the team had consulted with EY's controversy experts, who had significant experience working at the IRS on transfer pricing issues.

---

[2]     Under the arm's length standard, two parties engaged in a transaction must act independently without unduly influencing each other.  This is an essential standard in transfer pricing, where two related entities engaging in an intercompany transaction must behave as though they were unrelated.  See I.R.C. § 482.

73.     The memo concluded that in the appeals settlement process with the IRS, a potential tax adjustment could be in the range of $539 to $569 million or $639 to $678 million based on two different probabilistic scenarios.  In the litigation resolution process, the memo concluded that the tax adjustment could be in the range of $770 to $823 million.  Therefore, Ghose concluded that to comply with U.S. tax laws, Suspect Client A should have a reserve of $800 million to cover potential tax adjustments for the years 2012-2018.

### G.     After ignoring Ghose and her team's position and expertise, EY acquiesces to Suspect Client A's position and decides a reserve is unnecessary

74.     Ghose did not receive any response to the memo for five days.  On July 15, 2020, she followed up with Landry to see if he had any questions.  Landry's response was curt, and he informed her that he had no questions, and the memo was on-file.  Ghose received no further response until she learned that EY had decided that Suspect Client A1 did not need a reserve.

75.     On July 23, 2020, Landry followed up with Ghose and suggested that he, Rychlicki, and Ghose have a call the next week to discuss the process that EY had gone through with the client.  He instructed her that no more work was needed on the account that quarter. Ghose replied that she would be interested to understand EY's decision – a decision that completely ignored her recommendation and the NOPA, and appeared to be driven solely by a desire to please Suspect Client A.

76.     Ghose never heard back from Landry about the call. Seeking to better understand the decision-making process and concerned that EY was potentially facilitating securities and tax fraud by enabling Suspect Client A to avoid keeping a reserve of funds,  Ghose followed up on August 19, 2020.  She asked that Landry share any memo, document, or other information that EY had compiled in making its decision so that she could understand what evidence led to EY's conclusion.

77.     Raza Khan ("Khan"), EY's U.S. lead audit partner on Suspect Client A from assurance services, responded that after a significant number of calls between EY and Suspect Client A's management about Ghose's team's conclusion and the NOPA, ultimately, Suspect Client A decided not to keep a reserve because the company did not believe it had liability. When Ghose asked if there was any risk to EY auditors if the IRS orders Suspect Client A to adjust $500 million or more, Khan responded that there is always risk to the firm when issuing an audit opinion, but as long as they have done enough work and used appropriate judgment, risk is minimized.  Ghose never received a response from Landry in response to her requests for an explanation of why EY decided to acquiesce to Suspect Client A's opposition to maintaining a reserve for this tax liability.

78.     In September, Rychlicki, who took Landry's position after he retired, informed Ghose that Suspect Client A wanted EY to share their interest rate benchmarking data with them. Ghose explained that interest rate benchmarking data did not affect credit rating determinations, and PwC had performed a separate interest rate benchmarking analysis, which aligned with EY's assessment.  Therefore, Ghose advised that EY focus on the primary issue, the correct credit rating for Suspect Client A1, which was unrelated to interest rate benchmarking.

79.     On October 28, 2020, Rychlicki contacted Ghose and told her that Suspect Client A had requested a different transfer pricing team to review its transactions going forward, and when he responded that he would not switch the team, Suspect Client A requested an independent reviewer for the account.  Rychlicki had appointed Farhat to be the independent reviewer.

80.     On November 4, 2020, Rychlicki sent Ghose Suspect Client A's response to the NOPA, which Suspect Client A had already sent to the IRS.  As she reviewed the response,

Ghose noted various concerns with Suspect Client A's position, many of which she had noted early on in and throughout her review of the case.  These issues included that 1) The response primarily focused on the best method for determining Suspect Client A1's credit rating, rather than the reasonable credit rating given all publicly-available information from the company; 2) The document contradicted itself about how Suspect Client A3's credit rating has been assessed; and 3) The document claimed, inaccurately, that the ratings of a borrower's subsidiaries are unimportant to an unrelated lender.[3]

81.     Ghose outlined the abovementioned issues with Suspect Client A's response to the NOPA on a November 5, 2020 call with Rychlicki.  Rychlicki replied that although he is not an expert on these issues, Suspect Client A appeared to have not provided any new information that helped to support their position.

82.     On November 11, 2020, Ghose contacted Rychlicki to reiterate her belief that Suspect Client A's position was unreasonable, and the company's response to the NOPA had not changed her opinion.  She noted that the response focused on Suspect Client A's belief that Moody's grid was the correct method for determining Suspect Client A1's credit rating, and Risk Calc, at least as the IRS had used it, was unreliable.  She emphasized her belief that the response to the NOPA was flawed and included inconsistencies.  Finally, she reiterated that the response

---

[3]     Any borrower's credit rating is determined by its consolidated financial position, including the quality of its investments (e.g., the credit quality of its primary operating entity).  It is well-documented that the credit rating of any holding company (*e.g.*, Suspect Client A1) is dependent on and closely related to the credit rating of its primary operating entity (*e.g.*, Suspect Client A3).  *See* Egan-Jones Ratings Co., *Procedures and Methodologies for Determining Credit Ratings*, Appendix 4, *available at* https://www.sec.gov/Archives/edgar/data/1651331/000165133115000003/NRSRO_Exhibit_2_0 93015.pdf

did not change her original position, which was that the company should have a reserve of approximately $800 million to cover possible tax adjustments from the IRS.

83.     Ghose learned in January 2021 that EY finally recommended that Suspect Client A maintain a reserve, but the recommendation ($300 million) was still lower than the range proposed by Ghose.  Landry made the $300 million recommendation, but he is not a transfer pricing expert or a controversy expert and therefore is not qualified to make this recommendation or conclusion.

84.     It appears that the specific amount was determined to avoid disclosing the potential liability to the shareholders which should have been disclosed as soon as the finalized NOPA was received in June.

## IV.   GHOSE DISCOVERS AND DISCLOSES POTENTIAL TAX FRAUD ON THE ACCOUNT OF SUSPECT CLIENT B

### A.   Ghose and her team evaluate an intercompany loan termination that results from Suspect Client B separating a business line from its parent entity

85.     In April 2020, Ghose and her team were asked to assess a transfer pricing issue related to Suspect Client B spinning off a business line into an entity that would be distinct from the parent corporation.  As part of the restructuring, a $1.7 billion intercompany loan between two US affiliates, Suspect Client B1 and Suspect Client B2 (the business line) was terminated early because the two entities would no longer be affiliated sometime in future.  Ghose learned that as part of the early termination, in addition to paying the full amount of the remaining loan plus interest, Suspect Client B2 (borrower) had paid a make-whole premium of approximately $721 million to Suspect Client B1 (lender).  This make-whole payment would allow Suspect Client B2 to take an approximately $180 million tax benefit in the U.S.

86.     At the outset, Ghose and her team were concerned that the make-whole payment was far too large.  On April 14, 2020, Ghose's team first alerted EY GCR that the IRS could flag such a payment as unreasonable and the transaction as not having been made at arm's length.

87.     After their initial review of the loan from Suspect Client B1 to Suspect Client B2, as well as the termination fee, Ghose's team alerted EY GCR on April 21, 2020 that they had determined that the amount of the make-whole payment was unreasonable.  They explained that they agreed with the company that the loan had been at arm's length when Suspect Client B1 had originally made it to Suspect Client B2 in 2015, but the $721 termination fee paid by Suspect Client B2 did not comply with the standard.  The team had determined that the payment was significantly higher than it should have been.

88.     The team continued in detail to explain why the make-whole payment was unreasonable.  To assess whether the fee was reasonable and had been made at arm's length, the team explained that from a transfer pricing perspective, they had to assess whether Suspect Client B2 would have been willing to pay such a fee to an unrelated third party, and how Suspect Client B2 would have benefitted from the termination and payment of the fee.  Based on the loan agreement language, the team had determined that at arm's length, Suspect Client B2 would not have paid a fee that would have left them in a worse position than if they had kept the loan.

89.     The team then assessed Suspect Client B2's credit rating, which they determined was BBB.  Finally, based on the credit rating, the team evaluated applicable interest rates and determined that an appropriate make-whole payment would have been $78.19 million.  Even if Suspect Client B2's credit rating had been A+, the team determined that an appropriate amount for the payment would have been $299.30 million, significantly less than the $721 million that was paid.

90.     On two calls on April 22, 2020 with Brent Ashton ("Ashton"), an audit partner,
Petter Wendel ("Wendel"), a senior FSO tax partner and Hilary Hansen ("Hansen"), senior FSO
audit partner, EY Germany Representatives, and others, Ghose communicated her concern that
the amount and payment of the make-whole penalty did not comply with the I.R.C. and caused
significant tax and legal liability to Suspect Client B.

**B.      Suspect Client B asserts that the lender is entitled to the make-whole
        payment, despite Ghose and her team's assertions**

91.     Ghose's team informed Suspect Client B that they did not agree with the
company's position that the $721 million termination fee that Suspect Client B2 had paid to
Suspect Client B1 complied with arm's length principles, and the fee was far higher than it
should have been.  The next day, on April 23, 2020, Ghose's team had a call with Suspect Client
B, EY Germany, the EY audit team, and EY GCR, where Ghose stood her ground and Suspect
Client B attempted to justify the transaction.

92.     On the call, Suspect Client B insisted that Suspect Client B1 had to call the loan
due to regulatory restrictions, and the company contended that Suspect Client B1 was entitled to
the make-whole payment even though it had been Suspect Client B1, as the lender, that had
triggered the early termination of the loan.  Suspect Client B emphasized that its third-party
bonds work the same way.  In response, Ghose's team requested to see Suspect Client B's third-
party bond agreement and any evidence that would show that Suspect Client B would make a
similar make-whole payment on a third-party bond, where the lender triggered the early
termination.

93.     After the call, Ghose's team discussed internally what supporting information
they would need from Suspect Client B.  Specifically, the team requested that Ashton ask
Suspect Client B to provide them with 1) an explanation of why the termination fee Suspect

Client B2 paid to Suspect Client B1 was consistent with the arm's length standard as articulated in I.R.C. §482 (the team also noted internally that Suspect Client B's policy of using group credit ratings and cost of funds for all entities is inconsistent with U.S. transfer pricing regulations as set out in Treas. Reg. 1.482-2); and 2) some evidence that the third-party bond Suspect Client B had mentioned as having a similar make-whole provision had similar features to the loan at issue.

94.     In response, on April 24, 2020, Suspect Client B sent EY a memo explaining the company's position that 1) under the terms of the loan agreement at issue, the loan had to terminate because Suspect Client B2 was to become an unrelated entity; 2) when the loan terminated, Suspect Client B2 was required to compensate Suspect Client B1 according to the terms of the agreement; and 3) the termination payments met the arm's length standard as set out in I.R.C. § 482.  The memo continued that because Suspect Client B2 was set to leave Suspect Client B globally, according to the terms of the loan, Suspect Client B1 was entitled to declare all obligations immediately payable in full, and these obligations included the termination fee. Suspect Client B's memo also explained that Suspect Client B1 had a right to a make-whole payment in this situation, where Suspect Client B1 exercised its right under the terms of the agreement to demand early repayment due to a good-faith belief that Suspect Client B2 would leave Suspect Client B entirely.  Suspect Client B also stated that according to the terms, Suspect Client B1 had a right to unilaterally determine what that fee should have been.

95.     As for the transaction being at arm's length, Suspect Client B asserted that unrelated parties would enter into a similar loan agreement under similar circumstances because it was reasonable for a lender of large amounts to receive an early termination fee to protect its interests.  Suspect Client B explained that it believed the amount of the termination fee was reasonable because Suspect Client B1 wanted to be made whole for any losses incurred due to

the early termination of the loan, and although EY suggested creditworthiness was relevant in calculating the termination fee, Suspect Client B1 disagreed.  Finally, Suspect Client B stated that because Suspect Client B2 had agreed to these terms at the start of the loan, and again when it had signed modifications to the agreement, EY should not question the agreement's compliance with arm's length principles.

### C. Ghose and her team disagree with Suspect Client B as to whether the transaction complies with relevant tax laws

96.     After reading the language from the third-party bond agreements, Ghose and her team determined that Suspect Client B had not clarified whether it would have paid a termination fee on these bonds if the bondholders had terminated the bonds early.  According to the language provided, Ghose and her team understood that Suspect Client B would have had to pay a termination fee *only if Suspect Client B had initiated the early termination*, but not if the bondholder had done so.

97.     Ghose clarified that the key question was whether Suspect Client B would represent to EY that in the case of these third-party bonds, if the holders were to demand immediate redemption, whether Suspect Client B would be willing to pay a make-whole payment, as Suspect Client B2 had paid to Suspect Client B1.  When asked, Suspect Client B confirmed that the make-whole fee would apply regardless of which entity triggered the termination.

98.     After Suspect Client B made this statement, Ghose and her team further discussed the issue.  The team cited two points of disagreement with Suspect Client B's position.

99.     First, the team did not believe that the agreement between Suspect Client B1 (lender) and Suspect Client B2 (borrower) required a make-whole payment where Suspect Client B1 demanded repayment under conditions of default, even if the reason for the termination was

Suspect Client B1's good-faith belief that Suspect Client B2 would no longer be under Suspect Client B's control.  Based on preliminary research on relevant contract law issues, the team found a case, *In re AMR Corp.*, 730 F.3d 88 (2d Cir. 2013), where the court came to the opposite conclusion as Suspect Client B's position regarding the make-whole payment.  In the case, the court held that where the debtor filed for bankruptcy and triggered a default, the debt automatically accelerated, and therefore the debtor's attempt to repay the debt after the bankruptcy filing was a post-maturity payment that did not trigger a make-whole termination fee.  Similarly, in Suspect Client B's case, where Suspect Client B2's anticipated change in control accelerated the debt and caused a default, Suspect Client B2's payment of the debt was not a prepayment triggering the make-whole amount, but a post-maturity payment, where the make-whole fee should not have been triggered.

100.    Second, Ghose and her the team did not agree with Suspect Client B's position that, if the bondholder was to demand immediate repayment, Suspect Client B's third-party bond agreement would result in the company paying the make-whole fee.  So, for the team to decide that Suspect Client B's position was reasonable considering the arm's length standard, the team would have to rely on Suspect Client B's representations alone.

101.    Therefore, the team requested that Suspect Client B represent officially in writing that if a bondholder of an aforementioned third-party bond were to demand redemption, Suspect Client B would pay the holder the make-whole amount, even though the language of the bond agreement may not have actually required such a payment.

102.    That night, Ashton informed Ghose and her team that Suspect Client B had refused to make the representations EY had requested.

**D.    Suspect Client B continues to change its story, and Ghose and her team insist the company's position is unreasonable and unsupported by evidence**

26

103.    On May 20, 2020, Suspect Client B sent EY a report that PwC had compiled for the company on the make-whole provision.  Suspect Client B apparently expected that this report would ease EY's concerns about the payment not having been made at arm's length.  However, as Ghose pointed out after her initial review of the report, it did not address why the loan had been terminated, and based on why the loan was terminated, whether Suspect Client B2 should have paid the termination fee.  The report was premised on the flawed assumption that the fee should have been paid and instead focused on how to calculate such fees.  After carefully reviewing the PwC report, Ghose and her team determined that the report did not support Suspect Client B's position, and they decided that Suspect Client B would still need to send significant supporting documentation for the team to agree that the payment was reasonable.

104.    On May 22, 2020, the team compiled a list of support that Suspect Client B would have to provide for the team to be able to conclude that Suspect Client B2's payment had been made at arm's length.

105.    First, the team determined that they would have to understand the business purpose of the termination and make-whole payment from Suspect Client B2's perspective as though Suspect Client B2 had been a stand-alone entity.

106.    Second, they would have to see an economic analysis of the benefit that Suspect Client B2 as a stand-alone entity received in making the payment, such that Suspect Client B2 would have been no worse off paying the debt in full plus the make-whole fee than if it had not done so.  The team explicitly stated that demonstrating that the amount of the make-whole payment was consistent with the amounts of other make-whole payments in different debt situations would not suffice.

27

107.    Third, the team requested to see an analysis of Suspect Client B2's available options, including reliable evidence that Suspect Client B2 had not had another, better option than paying the loan in full plus the make-whole fee, and evidence supporting the fact that Suspect Client B2 would not have been in a better position if it had refused to pay the make-whole fee.

108.    After some delay, on July 13, 2020, Suspect Client B sent EY a new opinion from PwC meant to address Ghose and her team's concerns.  Instead, the report hardly addressed any of the points the team had specifically mentioned nearly two months earlier.

109.    On July 14, 2020, Ghose's team communicated to EY audit and GCR that the PwC opinion was not helpful because it failed to address most of the team's concerns.  The team explained that the opinion provided no analysis for key issues they had asked Suspect Client B to address, and the opinion did not address their second point requesting an analysis of the benefit to Suspect Client B2 as a stand-alone entity nor their third point requesting an analysis of Suspect Client B2's available options.  Notably, as for the second point, where Ghose's team stated that it would not suffice to demonstrate that the make-whole amount was consistent with other make-whole payments in other third-party debt circumstances, the only analysis PwC had provided focused on the amount of the payment and the reasonableness of that amount.

110.    As for the first point, the report vaguely addressed the business purpose for making the payment for Suspect Client B2 as a standalone entity.  The opinion stated that the Suspect Client B business line that was being spun off (which would include Suspect Client B2) wished to be debt-free before going public, and that Suspect Client B2 did not need the loan funds under its post-spin-off structure.  Still, the opinion provided little to no support for these positions, and these statements implied that it was Suspect Client B2 and not Suspect Client B1

28

that had initiated the prepayment.  This was the opposite position of that Suspect Client B had taken just months earlier.

### E.    Ghose and her team make a final attempt to sign off on Suspect Client B's position by asking the company again for representations concerning critical evidence supporting the make-whole payment

111.    In response, Ghose and her team sought to find further support for their position that the make-whole payment was unreasonable and did not comply with relevant tax laws.

112.    They consulted a managing director of financial services transfer pricing who is also a lawyer.  They ultimately concluded that the I.R.C. and treasury regulations require that an intercompany transaction have a business purpose and that the arm's length nature of a transaction requires consideration of realistic alternatives and a conclusion that neither party had a realistic, better alternative.  They also concluded that before any charge is made between members of the same entity, a member must have performed services for the benefit of the other entity or for the benefit of all members of the group.

113.    Ghose's team stated that even if they were to assume that they agreed with the amount of the make-whole payment, PwC's opinion did not address realistic alternatives or whether Suspect Client B2 had received any benefit from the payment.

114.    Ghose's team determined that they should attempt to gather information from Suspect Client B one last time in a final effort to sign off on the make-whole payment and related U.S. tax deduction.

115.    On July 17, 2020, a senior manager for transfer pricing working under Ghose, emphasized internally the unreasonableness of Suspect Client B's position.  He stated that the day before, Suspect Client B had disputed once again whether and how the early termination of a

loan interacts with a make-whole payment, and that Suspect Client B's view was not supported by EY's extensive analysis or any evidence, or lack thereof, that Suspect Client B had provided.

116.    On July 20, 2020, Ghose's team sent Joe McCormack ("McCormack"), a GCR partner, and Ashton a final request for representations of evidence from Suspect Client B.  The request stated that, based on what the team had seen to that point, they had not seen sufficient evidence to support a U.S. tax deduction based on a $721 million make-whole penalty.  Their request continued that the team would not usually ask a client for its own representations of evidence; standard procedure would be for the team to review the evidence itself.  However, since Suspect Client B had not provided relevant evidence after various requests, the team had compiled representations for the company to agree to.

117.    The representations Ghose and her team requested that Suspect Client B make in order for Ghose to sign off on the transaction and the related U.S. tax deduction were based on Suspect Client B's shifting arguments as to why the transaction had been made at arm's length, including their shift in position from Suspect Client B1 (lender) calling the loan to Suspect Client B2 (borrower) deciding to terminate early.

118.    Among other things, the team asked that Suspect Client B represent that they had evidence to support their position that they would be able to produce in tax court.  Ghose and her team requested this information because without supporting documentation, they had a reasonable belief that Suspect Client B's behavior violated tax laws by leading to a higher-than-necessary deduction and securities laws by making the company's financials look stronger than they really were.

119.    In response to the representation request, McCormack reported that he and Ashton had sent the representations to EY Germany for their feedback.  Ashton responded that he had

30

heard from EY Germany and that they would review and respond to the representations the next day.

**F.    The EY audit team informs Ghose that Suspect Client B has provided <u>sufficient information and asks another partner to sign off on the transaction</u>**

120.    Ghose, based on her reasonable belief that without further support for Suspect Client B's position the make-whole payment and related U.S. tax deduction violated the arm's length principle and federal tax and securities laws, refused to sign off on the transaction without receiving more information.  Ghose, and her team agreed that without providing further evidence or support, the company had not provided sufficient support for their assertions to the transfer pricing team.

121.    On July 21 and 22, 2020, Ashton, without referencing the team's most recent representation request and without receiving any official representation from the client, informed Ghose and her team that the client had provided sufficient support for why the make-whole payment had been reasonable (Ghose is unsure if EY ever sent the client her team's final representation request).

122.    Further, Ashton informed Ghose that another transfer pricing partner had been assigned to the case to review the transaction.  Rebecca Coke ("Coke"), the new partner assigned to the case, is not a subject matter expert in financial transactions and has significantly less experience than Ghose in transfer pricing issues pertaining to financial transactions such as intercompany loans and early termination of such loans.

123.    On July 22, 2020, Ghose and her team outlined their concerns with Suspect Client B's position to Coke, so that she would be updated on the matter and take their concerns into account.  They focused on their main concerns regarding: 1) whether the $721 million make-whole payment was deductible for U.S. income tax purposes; 2) whether Suspect Client B2 had

had a realistic alternative that would have been better than paying that amount; and 3) whether Suspect Client B2 had received a benefit commensurate with the cost of paying the fee. The team never received a response or acknowledgment from Coke.

124.    Ghose received confirmation from Coke much later, on an unrelated call on August 14, 2020 (and only after Ghose specifically asked her about the issue) that Coke had signed off on the transaction without raising any of Ghose's team's concerns.

125.    In August 2020, Ghose reached out to Tracee Fultz ("Fultz"), EY Americas head of transfer pricing, for feedback on how the transfer pricing team could better coordinate their processes and manage risk in cases of disagreement on technical issues (without mentioning Coke or the issues regarding Suspect Client B). Fultz's response revealed that she was well aware of the disagreement about the Suspect Client B's make-whole payment. Fultz stated that Coke and EY Germany disagreed with Ghose's position, which indicated to Ghose that there was widespread discussion among EY transfer pricing leadership about Ghose exercising professional skepticism and asking the right questions. EY Germany had consistently pressured Ghose to sign off on the transaction. Notably, EY Germany is not qualified to provide any advice on U.S. tax issues.

126.    Ghose and Fultz further discussed the issue on September 11, 2020, and Ghose requested that EY and the transfer pricing team improve the process for reviewing decisions and dealing with disagreements. Ghose suggested that the team create a best practices checklist.

127.    Fultz's reply was that the audit team would block such a checklist, because having a checklist would make it possible to demonstrate where EY did not follow proper procedures and protocols.

## V.     EY RETALIATES AGAINST GHOSE FOR HER DISCLOSURES AND REFUSAL TO PERPETUATE FRAUD

### A.     Ghose receives a performance rating of "needs to progress" – the lowest possible rating, and a steep decline from her previous ratings

128.     Throughout her previous thirteen years with EY, Ghose consistently received positive performance reviews.  Although EY changed the rating system recently to make the system more subjective, Ghose continued to exceed expectations under the new system, and for FY 2018 and 2019, she received a rating of "differentiating," the third of four possible levels.

129.     However, once she reported her concerns about the Suspect Clients potentially violating tax and securities laws, EY retaliated against Ghose and her performance rating dropped significantly.

130.     On August 26, 2020, Ghose had a scheduled call with Tsiopoulos and Chris Housman ("Housman"), FSO international tax and transaction services leader. For most of the call, the three spoke of assorted, unrelated issues, including challenges Ghose had faced on the Suspect Clients' accounts.

131.     In the last five minutes of the call, Tsiopoulos and Housman told Ghose that her rating for the year was "needs to progress" – the lowest possible rating, and two levels below the rating she received for the previous two years.

132.     This came as a complete surprise to Ghose, and in fact, in meetings on May 13 and 14, 2020, Tsiopoulos had told her that he had enough information to be able to successfully defend her meeting her revenue goals and other performance objectives for FY 2020.

133.     Now, on August 26, 2020, and after various reports of potential tax and securities violations, Tsiopoulos and Housman falsely asserted that Ghose had not met her revenue goals. Ghose immediately expressed opposition to the rating; however, Tsiopoulos and Housman

quickly mentioned that they had run out of time and promised to hold a follow up call on August 31, 2020 to discuss the matter further.

134.    Later on August 26, 2020, Ghose told Tsiopoulos and Housman that she believed that they had used her revenue numbers through April as her numbers for the full year, and therefore they had only assessed her based on 10 months of work without confirming what work she had delivered through May and June.  She continued that she did not understand how Tsiopoulos and Housman could have accurately assessed her year-end performance without considering the full year's revenue.

135.    Ghose later followed up to confirm how she had been assessed regarding her revenue goals, because she believed that her work and utilization had been incorrectly evaluated. She believed she had far exceeded her FY 2020 revenue goal of approximately $3 million, because the last time she had seen her team's revenue numbers on April 10, they were on track to well exceed that number.

136.    Housman emphasized that Ghose had performed from a sales goal perspective but not regarding her revenue goal, and that they had assessed her revenue as split equally between she and Jain, a first-year partner (which was an unreasonable method to allocate revenue to partners with different levels of experience and utilization).  Ghose noted that because Jain was a first-year partner with no official revenue goal, she was confident that her revenue had exceeded her target.  Upon information and belief, EY does not split revenue equally between any other two partners in EY with similar levels of experience and utilization as Ghose and Jain.

137.    At the last minute, Tsiopoulos cancelled their scheduled August 31, 2020 follow-up meeting to discuss Ghose's rating.  Later that day, Ghose and Housman had a one-on-one

conversation regarding her rating.  Housman stated that the rating was based on what he thought Tsiopoulos and Ghose had agreed on as her revenue number, which was incorrect.

138.    Housman stated that he believed that Ghose and Tsiopoulos had agreed that Jain and Ghose would split the team's total revenue equally.  This also was incorrect.  Indeed, there had been some confusion throughout the year as to Ghose and her team's revenue goals, with Tsiopoulos attempting to change the numbers throughout.

139.    Ghose sent Housman a revenue analyzer, a file that the finance department produces that helps to estimate revenue accurately for various projects.

140.    The last version Ghose had seen was as of April 10, 2020 (Ghose had asked Tsiopoulos to see the updated file in May, but he had refused to show it to her, although he had previously shared the file with her bi-weekly).

141.    Ghose pressed Housman on the fact that she believed that neither he nor Tsiopoulos had performed a revenue analysis on her numbers for the full year.  Housman said he would investigate the issue, but also told Ghose that even if they were to find that her revenue numbers had been calculated incorrectly, he would not modify her rating.

142.    Per Housman's request, Pam Wilcox ("Wilcox") in the finance department contacted Ghose.  When Ghose requested the updated revenue analyzer file, which included data through the end of June, from Wilcox, Wilcox repeatedly avoided responding to Ghose's requests to see the full file.  Instead, Wilcox proposed that Ghose give her the names of specific people whose time entries she could search for and relay to Ghose.

143.    In the past, Wilcox had always suggested Ghose go to Tsiopoulos for the revenue analyzer file, and Tsiopoulos had usually been willing to share the file (in fact, Tsiopoulos had often shared the file with non-partners to assist him in analyzing the data).

144.    Ghose most recently asked Housman about her FY 2020 revenue analysis on January 13, 2021.  He admitted that he had not looked into the issue and stated that he instead wanted to focus on FY 2021 revenue measurement.

**B.**    **Ghose receives a significantly lower salary increase than in previous years**

145.    On September 22, 2020, Shawn Smith, Housman's immediate boss and FSO tax managing partner, informed Ghose that she would receive a $20,000 salary increase for the next year, resulting in a less than three percent raise and significantly less than what she had received in the previous two years.  Upon information and belief, no other partner finishing up their fifth year with performance that was objectivly similar to Ghose's received such a small raise.

146.    As a partner completing her fifth year, Ghose was still in the ramping up stage, where she should have received a significant raise.  She received a $100,000 increase at the end of FY 2018 and FY 2019.

147.    In their September 22, 2020 meeting, Ghose asked if Smith had heard from Housman and Tsiopoulos on any follow-up revenue analysis for her FY 2020 assessment.  Smith said Housman had not contacted him to ask about or follow up on the revenue analysis, as Houseman told Ghose he would do.

**C.**    **Ghose is removed from the Suspect Client B's account**

148.    On September 24, 2020, Ghose had a call with Ashton, who told her that EY was removing Ghose and her team from the Suspect Client B's account and confirmed that she and her team should stop any other work they were doing for this client.  He assured her that this was not due to Ghose and her team's quality of work or responsiveness, and instead he stated that Suspect Client B needed a new perspective from EY because the company did not see eye-to-eye with Ghose and her team.  Ghose responded by noting that Lisa Blanchard ("Blanchard"), the

replacement partner who would be signing off on future financial transactions for Suspect Client B is not a subject matter expert on financial transactions, but it appeared that this was what EY wanted.

149.    That day, Ghose informed her team that they were being taken off the account. Per her earlier call with Ashton, she asked them to stop all work for Suspect Client B related to the review of their financial transactions.

150.    After Ashton informed Ghose that she and her team would be removed from the account, there was some confusion within EY as to who would be taking over and when. Although EY had assigned a new transfer pricing team to the account, the new lead partner, Blanchard, who was aware of controversy pertaining to the Suspect Client B2 loan termination, refused to sign off on any financial transactions for the remainder of the year.

151.    Although Ashton had explicitly communicated to Ghose that she and her team should stop work on the account, he then changed course and said the expectation was that Ghose would continue to sign off on other routine transfer pricing issues for the client just through the end of the year and would then stop performing any work on the account.

152.    On October 6, 2020, on a call with Ashton, Hansen, and a few others, Hansen insisted that Ghose could continue to sign off on the Suspect Client B account for the remainder of the year, even though EY had removed Ghose from the account.

153.    Ghose replied that she was not inclined to sign off on the account – the client and EY had removed her from the account because she had taken a principled position, and therefore she had reservations about signing off on an account she was not part of.

154.    On the call, Wendel, the tax lead on the account suggested that he would work with the senior manager who had been working under Ghose and then sign off when necessary.

Ghose was concerned that this arrangement would potentially breach EY audit standards, which require that a transfer pricing partner sign off on all transfer pricing issues.

155.    EY removed Ghose from the Suspect Client B account because she exhibited professional skepticism and asked the right questions, refused to perpetuate fraud, and instead took a principled position.  EY apparently decided to acquiesce to Suspect Client B's wish to have an auditor who would rubber-stamp Suspect Client B's characterization of the make-whole payment, rather than one who would insist on complying with the I.R.C.

156.    In its Global Code of Conduct, EY declares that "We support EY people and will withdraw from working for any clients that put EY people under undue pressure or threaten them in exercising their professional duties."

157.    Under the heading "Maintaining our objectivity and independence" in its Global Code of Conduct, EY sets forth the following policy: "We maintain and affirm our objectivity and independence, recognizing that these are critical to our professional responsibilities. We employ appropriate professional skepticism. We reject inappropriate pressure from clients or others."

158.    But in fact, when Ghose employed appropriate and necessary professional skepticism, EY retaliated against her and rewarded the clients' inappropriate pressure and bullying.

159.    EY's removal of Ghose from the Suspect Client B account was a traumatic experience for Ghose.  After being removed from the Suspect Client B account, Ghose was seen by her colleagues as a pariah.  EY's leadership undermined Ghose's authority with her team and harmed her reputation at the firm by influencing her colleagues and team members to avoid

interacting and working with her.  As a result EY's leadership's actions, Ghose's team and others at EY had reduced confidence in Ghose, her abilities, and her expertise.

### D.     EY does not consider Ghose for the Global Treasury Centre of Excellence or a promotion to FSO transfer pricing lead

160.    In late September, 2020, EY announced the Global Treasury Center of Excellence, a group of tax experts at EY who focus on financial transactions and whose knowledge EY intends to leverage to assist clients in dealing with financing, cash, and risk management.

161.    One of the areas of expertise in the group is intercompany financial transactions – Ghose's specialty, for which she is recognized as a top expert in the U.S.

162.    Instead of choosing Ghose to share her knowledge of transfer pricing issues, EY instead named two employees to the group who have less experience and knowledge on financial transaction related transfer pricing issues than Ghose has.

163.    Ghose is so well-regarded within EY for her transfer pricing expertise that many people reached out to her after the Treasury Center of Excellence was announced to ask her if she would be a part of the group.  When she responded that she was not included, her contacts responded that they would not join because not including Ghose as a transfer pricing expert made the initiative irrelevant.

164.    The opportunity to be a part of this initiative would have significantly bolstered Ghose's career.

165.    Further, in mid-October, 2020, Ghose discovered that EY was not considering her for the role of FSO transfer pricing lead, which EY filled when Tsiopoulos' contract ended in June 2021.  Ghose had previously expressed her interest in this position to Housman and Tsiopoulos.

166.     On October 21, 2020, Danielle Clark, who would be working with Housman on the selection process for FSO transfer pricing lead, spoke with Ghose about the shortlisted candidates and asked her what qualities she wanted to see in the next leader and what she thought of each of the candidates.

167.     Notably, other employees had filed sexual harassment complaints about two of the three candidates (the two candidates who were men).

168.     Specifically, the candidate finally selected (Jonathan Thompson) was the subject of an internal complaint (along with another male partner) after engagning in inappropriate sexualized banter, including playing the game "marry, fuck, kill" and pressuring junior staff members to respond even when an employee said they were not comfortable engaging in this game.

**E.     EY gives Ghose a second poor performance rating after submitting OSHA complaint**

169.     Ghose submitted a Complaint of Whistleblower Retaliation under SOX and TFA on February 17, 2021.

170.     On August 11, 2021, Ghose had her end-of-year review with Housman and  Mike Dilecce, FSO Americas managing partner, and she received the rating of "progressing" – the second lowest of four possible ratings.

171.     The "progressing" rating is lower than what Ghose should have received absent her protected activities.

172.     Without regard to Ghose's actual productivity and work performance, EY gave her a diminished performance rating in retaliation for her protected activities.

173.    During the August 11, 2021 conversation with Housman and Dilecce, Ghose asked, as she asked in 2020, to see the revenue analysis on which EY based her performance rating because EY bases partners' performance ratings on their revenue generation.

174.    As they did in 2020, EY refused to share with Ghose the revenue calculations on which it based her performance rating.

175.    In Ghose's year-end review, Housman told Ghose that EY calculated her revenue generation for FY 2021 to be $4.2 million, which he asserted included revenue generated for both the financial services transfer pricing team and regional transfer pricing teams, but EY appears to purposefully have used only the financial services transfer pricing team's revenue, which amounted to $4.2 million, to assess Ghose's revenue generation.

176.    The financial services transfer pricing and regional transfer pricing teams' revenue combined amounted to approximately $8 million for FY 2021, and Ghose should have been assessed on this revenue amount.  If Housman had correctly used the combined revenue of $8 million when assessing Ghose's performance, she would have received a rating of at least "differentiating," one step above her the rating of "progressing" which she received.

177.    In addition, Ghose's performance evaluation failed to take into account her significant "firm citizenship" activities and endeavors, including mentoring junior staff and helping the transaction tax team integrate with the transfer pricing team, as well as her substantial support for diversity and inclusiveness initiatives.

178.    On August 16, 2021, Ghose asked Housman again for the revenue analysis on which he based her FY 2021 rating.  She reiterated that after her FY 2020 review, she asked to see the analysis on which EY based her "needs to progress" rating, which she had not seen such

analysis (in fact, in one meeting on August 31, 2020, Housman stated to Ghose that EY had not conducted any independent revenue analysis to arrive at her FY 2020 rating).

179.    Ghose further reiterated that in a mid-year check-in for FY 2021, Pam Wilcox from the finance department performed a revenue analysis for Ghose's performance at Housman's request.  This analysis included only financial services office transfer pricing revenue and ignored all revenue Ghose had generated for other transfer pricing and international tax and transaction services teams.  Therefore, Ghose explained that she believes that again, EY deliberately incorrectly assessed her revenue generation in order to give her a lower rating than she was due.

180.    EY partners' annual pay increases are based on their performance ratings. Because Ghose received a lower rating than she deserved, she will also receive a decreased annual pay increase.

   **F.    EY subjected Ghose to a hostile work environment and constructively
   discharged Ghose's employment**

181.    EY constructively discharged Ghose's employment by sending a clear message to her that when she raises concerns about clients' potentially unlawful conduct, EY will not address her concerns and instead will punish her for raising them.

182.    By failing to remedy Ghose's legitimate concerns and ceding to the clients' improper demands, EY put Ghose in the untenable position of feeling like she would have to violate her professional duties to remain employed.

183.    Further, EY refused to discuss Ghose's concerns about Suspect Client accounts in any level of detail, although she has repeatedly asked for updates and more information since EY decided to ignore her position and concerns in mid-summer 2020.  This made her working conditions intolerable.

184.    EY also engaged in a campaign to sabotage Ghose's continued success at EY by circumventing her and excluding her from emails in various client accounts, including an account on which she recently secured a favorable tax ruling.

185.    Craig Hillier, EY Americas international tax and transaction services leader, continuously excluded Ghose from email communications regarding this client, thereby impeding Ghose's ability to perform additional work for the client.

186.    Ghose's overall email traffic about client matters significantly decreased since summer 2020 and fewer EY partners consulted with Ghose about transfer pricing issues after she reported her concerns.

187.    By circumventing Ghose, undermining her authority, blocking her from getting work, and setting her up to fail, EY has subjected Ghose to a hostile work environment and is rendering her working conditions intolerable.

188.    On November 23, 2021, due to the intolerable working conditions, Ghose served six months' advance notice of separation, as required by the EY partnership agreement.

**G.    EY terminates Ghose in further retaliation**

189.    During the notice period, EY abruptly terminated Ghose's employment on January 7, 2022.

190.    EY utilized a recent unilateral amendment to its partnership agreement to impede Ghose's ability to obtain other employment.

191.    On January 20, 2022, Ghose sought consent from EY, which she was required to obtain, to work at another public accounting firm.

192.    For more than eight weeks, EY withheld consent, without providing any reason for the delay, for Ghose to accept employment with another public accounting firm.

193.    On March 18, 2022, EY gave consent for Ghose to accept the offer of employment she received.

194.    Even after giving consent, on March 24, 2022, EY imposed several restrictions on Ghose's ability to accept employment at another public accounting firm.

## FIRST CAUSE OF ACTION
### Taxpayer First Act Whistleblower Retaliation
### Taxpayer First Act, 26 U.S.C. § 7623(d)

195.    Ghose hereby incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

196.    The TFA whistleblower protection law prohibits any employer from retaliating against an employee for reporting what that employee reasonably believes to be potential underpayment of tax or any conduct which the employee reasonably believes constitutes a violation of the internal revenue laws or any provision of Federal law relating to tax fraud, where that employee reports to a person with supervisory authority over the employee or any other person with the authority to investigate, discover, or terminate the misconduct.

197.    The TFA prohibits not only termination of employment, but also other retaliatory acts intended to dissuade a whistleblower from engaging in further protected conduct.[4]

198.    Ghose reasonably believed that Suspect Client A's conduct, which EY facilitated, potentially violated federal tax laws where Suspect Client A gave a lower-than-reasonable credit rating, Suspect Client A1 paid higher interest on loans than it should have, and Suspect Client A1 deducted more than it should have on its taxes. Further, she believed that the company's conduct

---

[4]    *See, e.g.*, *Halliburton, Inc.*, 771 F.3d at 259–62 (5th Cir. 2014) (unfavorable employment actions that are more than trivial, either as a single event or in combination with other deliberate actions by the employer, may constitute actionable retaliation, including the mere act of "outing" a whistleblower).

violated tax laws by not complying with the arm's length principle in violation of the Internal Revenue Code.

199.   Ghose disclosed her reasonable belief about Suspect Client A's conduct to those with supervisory authority over her or with the authority to investigate, discover, or terminate the misconduct on various occasions

200.   Ghose reasonably believed that Suspect Client B's conduct, which EY facilitated, violated federal tax laws where she raised concerns associated with the company's receipt of the make-whole payment, where the payment was unreasonable and did not comply with the arm's length principle, in violation of the Internal Revenue Code.

201.   Ghose disclosed her reasonable belief about Suspect Client B's conduct to those with supervisory authority over her or with the authority to investigate, discover, or terminate the misconduct on various occasions

202.   Defendant was aware of Ghose's protected activity concerning the Suspect Clients' accounts.

203.   Defendant took adverse actions against Ghose, including giving her a performance rating of "needs to progress," the lowest rating; giving her a reduced salary increase; removing her from the account of Suspect Client B; refusing to consider her for the global treasury COE and for a promotion to FSO transfer pricing lead; subjecting her to a hostile work environment; constructively discharging her employment; and then terminating her during her notice period after she provided notice of separation.

204.   Ghose's protected activity was a contributing factor in Defendant's decision to take adverse actions against her.

205.     As a direct and proximate result of Defendant's unlawful retaliatory conduct,

Ghose has suffered, and continues to suffer, harm, including, but not limited to, restricted future

employment opportunities, humiliation, embarrassment, reputational harm, emotional and

physical distress, injury, pain, ailments and conditions, mental anguish, and other economic

damages and non-economic damages, for which she is entitled to an award of damages to the

greatest extent permitted under law, in addition to reasonable attorneys' fees and costs and

reinstatement.

**SECOND CAUSE OF ACTION**
**Sarbanes-Oxley Whistleblower Retaliation**
**Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A, *et seq.***

206.     Ghose hereby incorporates the allegations set forth in the foregoing paragraphs as

though fully alleged herein.

207.     Section 806 of SOX prohibits publicly-traded companies and contractors,

subcontractors, and agents of publicly-traded companies from retaliating against employees who

provide information to a covered employer, a federal agency, or Congress regarding conduct that

the employee reasonably believes constitutes a violation of 18 U.S.C. §§ 1341 (mail fraud), 1343

(wire fraud), 1344 (bank fraud), or 1348 (securities fraud), or any rule or regulation of the

Securities and Exchange Commission, or any provision of federal law relating to fraud against

shareholders.  18 U.S.C. § 1514A(a).

208.     The Supreme Court has held that protecting agents, contractors, and

subcontractors, including auditors from retaliation where those agents uncover and report

securities fraud perpetrated by public companies is consistent with the plain meaning of SOX as

well as Congress's intent in passing the statute to protect employees of organizations that may

facilitate the fraud but who may not necessarily work directly for the publicly-traded company. *See Lawson*, 571 U.S. at 447-48.[5]

209.    To engage in SOX-protected activity, a "complainant need only show that he or she 'reasonably believes' that the conduct complained of constitutes a violation of the laws listed in Section 1514A." *Sylvester v. Parexel Int'l LLC*, ARB 07-123, 2011 WL 2165854 at *11 (ARB May 25, 2011).[6]  SOX protects "'all good faith and reasonable reporting of fraud.'" *Id.* at *14-15, 30 (quoting 148 Cong. Rec. S7418-01, S7420).  Protection attaches when the employee provides information or assistance to anyone in the company with "supervisory authority over the employee" or with authority to "investigate, discover, or terminate misconduct." 18 U.S.C. § 1514A.

210.    A company may violate SEC Rule 10b-5 when making public disclosures if it misstates or omits a material fact. *See* 17 C.F.R. § 240.10b-5.

211.    Section 806 of SOX proscribes not only termination of employment, but also other retaliatory acts intended to dissuade a whistleblower from engaging in further protected conduct.  *See Halliburton, Inc. v. Administrative Review Board*, 771 F.3d 254, 259–62 (5th Cir. 2014) (unfavorable employment actions that are more than trivial, either as a single event or in

---

[5]    Since *Lawson*, several federal courts have held that a contractor/agent's whistleblowing must be related to her provision of services to the public company, and that the fraud must have been perpetrated by or closely related to actions performed by the public company. *See, e.g.*, *Gibney v. Evolution Mktg. Research, LLC*, 25 F. Supp. 3d 741 (E.D. Pa. 2014); *Anthony v. Nw. Mut. Life Ins. Co.*, 130 F. Supp. 3d 644 (N.D.N.Y. 2015).

[6]    Several federal courts have adopted the ARB's decision in *Sylvester*. *See, e.g.*, *Lockheed Martin Corp. v. Admin. Review Bd.*, 717 F.3d 1121, 1132 n.7 (10th Cir. 2013); *Wiest v. Lynch*, 710 F.3d 121 (3d Cir. 2013) (holding that *Sylvester* is entitled to *Chevron* deference); *Leshinsky v. Telvent GIT, S.A.*, 942 F. Supp. 2d 432, 443 (S.D.N.Y. 2013); *Stewart v. Doral Fin. Corp.*, 2014 WL 661587 (D.P.R. Feb. 21, 2014).

combination with other deliberate actions by the employer, may constitute actionable retaliation, including the mere act of "outing" a whistleblower).

212.    Ghose reasonably believed that Suspect Client A's failure to maintain a reserve to cover a likely $1 billion tax liability potentially violated federal securities laws and could mislead current and prospective shareholders. This failure to account for unreasonable and unlawful deductions and refusal to maintain a reserve to cover an adjustment made the company's financials appear stronger than they were, amounting to a potential misstatement or omission of a material fact.

213.    Ghose's disclosures about Suspect Client A's failure to disclose a $1 billion tax liability also implicated the adequacy of Suspect Client A's internal controls over financial reporting.  Section 302 of SOX requires a corporation's CEO and CFO to personally certify the accuracy and completeness of financial reports, and they must assess and report on the effectiveness of internal controls around financial reporting.  15 U.S.C. § 7241.  Section 404 of SOX requires a corporation to assess the effectiveness of its internal controls in its annual reports, and an outside auditing firm must evaluate that assessment.  Material weaknesses in those internal controls must be identified. *See, e.g.*, 15 U.S.C. § 7213(a)(2)(A)(iii)(III).  Courts have routinely held that disclosures pertaining to violations of these requirements are protected under SOX.

214.    In securities fraud cases, courts have observed that inadequacy of internal accounting controls "are probative of scienter [defendant's intent to deceive, manipulate, or defraud] . . . and can add to the strength of a case based on other allegations." *Crowell v. Ionics, Inc.*, 343 F. Supp. 2d 1, 12, 20 (D. Mass. 2004) (citations omitted).  Significant deficiencies in internal controls, at least when combined with other substantial issues, would constitute a

circumstance likely to be "viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988).

215.    As required by SOX, Ghose provided information about what she believed were violations of relevant securities laws and SEC regulations to Landry and other EY personnel who had supervisory authority over her like Tsiopoulos, or who had the authority to investigate the misconduct.

216.    Ghose disclosed her reasonable belief about Suspect Client A's conduct on various occasions

217.    Defendant was aware of Ghose's protected activity concerning the Suspect Client A account.

218.    Defendant took adverse actions against Ghose, including giving her a performance rating of "needs to progress," the lowest rating; giving her a reduced salary increase; refusing to consider her for the global treasury COE and for a promotion to FSO transfer pricing lead; subjecting her to a hostile work environment; constructively discharging her employment; and then terminating her during her notice period after she provided notice of separation.

219.    Ghose's protected activity concerning Suspect Client A was a contributing factor in Respondent's decision to take adverse actions against her.

220.    As a direct and proximate result of Defendant's unlawful retaliatory conduct, Ghose has suffered, and continues to suffer, harm, including, but not limited to, restricted future employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, injury, pain, ailments and conditions, mental anguish, and other economic damages and non-economic damages, for which she is entitled to an award of damages to the

greatest extent permitted under law, in addition to reasonable attorneys' fees and costs and reinstatement.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that the Court enter judgment in her favor and against Defendant, containing the following relief:

A.    A declaratory judgment that the actions, conduct and practices of Defendant complained of herein violate the laws of the United States of America;

B.    An injunction and order permanently restraining Defendant and its partners, officers, owners, agents, successors, employees and/or representatives, and any and all persons acting in concert with them, from engaging in any such further unlawful conduct, including the policies and practices complained of herein;

C.    An award of damages against Defendant, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages, including, but not limited to, loss of past and future income, wages, compensation, seniority, and other benefits of employment;

D.    An award of damages against Defendant, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for his emotional distress;

E.    An award of punitive damages, if applicable, in an amount to be determined at trial;

F.    Liquidated damages, if applicable;

G.    Prejudgment interest on all amounts due;

H.    Reinstatement, a raise and/or a promotion;

I.       An award of Plaintiff's reasonable attorneys' fees and costs to the fullest extent permitted by law; and,

J.       Such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: September 14, 2022
       New York, New York

                                             **WIGDOR LLP**

                                             By: _____
                                                  Michael J. Willemin
                                                  Sagar K. Shah

                                             85 Fifth Avenue
                                             New York, NY 10003
                                             Telephone: (212) 257-6800
                                             Facsimile: (212) 257-6845
                                             mwillemin@wigdorlaw.com
                                             sshah@wigdorlaw.com

                                             *Attorneys for Plaintiff*